**Steven and Lisa RICHARDSON, on behalf of their daughter, Megan B. RICHARDSON, Petitioners,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 04–208V.

United States Court of Federal Claims.

Filed Under Seal: Nov. 10, 2009.

Reissued: Nov. 30, 2009.[1]

---

1. The Court issued this opinion under seal on November 10, 2009. Pursuant to Rule 18(b) of the Court's Vaccine Rules, the Court gave the parties 14 days, until November 24, 2009, to submit any proposed redactions of confidential or other protected information. The Court did not receive any proposed redactions by the required date. Accordingly, this opinion is released in its entirety.

**658**

Paul S. Dannenberg, Huntington, Vermont, for Petitioners.

Chrysovalantis P. Kefalas, with whom were Tony West, Assistant Attorney General, Timothy P. Garren, Director, Mark W. Rogers, Deputy Director, and Gabrielle M. Fielding, Assistant Director, Torts Branch, Civil Division, United States Department of Justice, Washington, D.C., for Respondent.

### REMAND ORDER

WHEELER, Judge.

This case is before the Court for review of the Special Master's July 30, 2007 Ruling on Onset and July 31, 2009 Decision on Entitlement dismissing Steven and Lisa Richardson's petition on behalf of their daughter, Megan Richardson, for compensation under the National Childhood Vaccine Injury Act of 1986, 42 U.S.C. § 300aa–2 *et seq.* (2006) (the "Vaccine Act"). Petitioners claim that Megan suffered seizures and related symptoms after receiving a Diptheria–Tetanus–acellular Pertussis ("DTaP") vaccination on March 26, 2001 at age 6–1/2 months. *See Doe v. Sec'y of Health and Human Servs.,* No. 04–208V, 2007 WL 6013964, at *1 (Fed.Cl. July 30, 2007)(redacted) (*"Onset Decision"*); *Doe v. Sec'y of Health and Human Servs.,* No. 04–208V, 2009 WL 2407407, at *1 (Fed.Cl. Spec.Mstr. July 31, 2009)(redacted) (*"Entitlement Decision"*).

■ Although family members and the treating physician testified that Megan began experiencing slight seizure episodes within one week after the vaccination, the Special Master rejected this evidence and relied instead on written notations in another doctor's medical records. The notations of Dr. Carol Baum, a hospital emergency room physician, show that Megan Richardson suffered an acute life threatening event from a four-minute seizure on April 14, 2001. Pet'rs Ex. T. Upon questioning the parents that day about Megan's recent medical history, Dr. Baum recorded that Megan had experienced two prior episodes "this week" when lying flat for a diaper change. *Id.* The Special Master surmised that the reference to "this week" in Dr. Baum's notations meant no more than seven days before April 14, 2001, and therefore ruled that the onset of Megan's seizures must have occurred no earlier than April 8, 2001, thirteen days after the DTaP vaccination. *Onset Decision* at *5. There is no evidence establishing April 8, 2001 as the onset date, but rather an assumption by the Special Master based upon Dr. Baum's notation. See id. Dr. Baum did not testify or provide an affidavit explaining her notation.

In reaching her conclusion about the onset of Megan's seizures and her ultimate decision on entitlement, the Special Master first conducted a fact hearing in Boston, Massachusetts on May 24, 2007, where she received the testimony of Megan's mother and father, and of Nancy Fleck, a close friend of Megan's mother. Hr'g Tr. 4–136 (May 24, 2007). Regarding the issue of onset, the record also contains sworn affidavits from Megan's mother and father, Megan's grandmother, a close family friend, and the treating physician, Dr. Thomas Johnston. *See* Pet'r Exs. G, H, N, O, P, 25, Q, and L. All of these persons maintain under oath that the onset of Megan's seizures occurred within one week after the vaccination. *See id.* Dr. Johnston did not have first-hand knowledge of the seizure episodes during the first week, but based his testimony on his knowledge of the Richardson family, particularly Megan's mother. Pet'rs Ex.L at ¶ 10. The Special Master rejected all of this evidence because there was no written confirmation in any medical record of onset during the first week. *Onset Decision* at * 32.

After issuing a Ruling on Onset on July 30, 2007, the Special Master conducted a second hearing on May 29, 2008 to receive by telephone the testimony of expert witnesses. Hr'g Tr. 141–327 (May 29, 2008). In the second hearing, Dr. Ronald Jacobson testified for Petitioners, along with Megan's treating physician, Dr. Johnston. Dr. Max Wiznitzer testified as an expert for Respondent. In receiving the expert testimony, the Special Master directed the witnesses to assume that the onset of the seizures occurred no earlier than April 8, 2001. Onset Decision at *33. This position reflected the Special Master's rejection of the sworn testimony and affidavits of each of the five fact witnesses.

The most troubling aspect of both hearings is the manner in which the Special Master conducted them. Upon review of the direct testimony of Megan's mother, Lisa Richardson, and of the treating physician, Dr. Johnston, the Court found that the Special Master interrupted the proceedings so frequently as to preclude any coherent direct testimony. In the 37 transcript pages of Lisa Richardson's direct testimony, the Special Master interjected her own questions and observations *on at least 113 occasions.* Hr'g Tr. 24–60. In contrast, Petitioners' counsel was able to pose only 25 questions. Id. Moreover, the Special Master's questions of Megan's mother typically were leading and opinionated, meaning that the witness essentially had to endure two cross-examinations instead of one. In the five pages of Lisa Richardson's redirect examination, the same format continued—30 interruptions from the Special Master, and only seven questions from Petitioners' counsel. Hr'g Tr. 102–106.

The direct examination of Dr. Johnston exhibited similar characteristics. In 19 pages of direct examination, the Special Master interrupted *39 times,* again in a cross-examining style, while Petitioners' counsel asked only 21 questions. Hr'g Tr. 216–235. Once again, the Special Master's interruptions precluded any coherent direct examination. In effect, the Special Master functioned as a third adversary to the proceedings, rather than as a judicial officer. Seemingly, the Special Master already had made up her mind that the medical records alone should dictate the outcome of the case—a conclusion of dubious validity. *See, e.g., Campbell v. Sec'y of Health and Human Servs.,* 69 Fed.Cl. 775, 779 (2006) (Contemporaneous medical records should generally be given more weight than later testimony but this rule is not absolute and "must yield where the factual predicates for its application are weak or lacking."); *Camery v. Sec'y of Health and Human Servs.,* 42 Fed.Cl. 381, 390–91 (1998) (Medical records may not always be the most trustworthy evidence available because they "may be incomplete or inaccurate."); *Murphy v. Sec'y of Health and Human Servs.,* 23 Cl. Ct. 726, 733 (1991) ("Since medical records typically record only a fraction of all that occurs, the fact that reference to an event is omitted from the medical records may not be very significant.").

█ The unfair procedures employed by the Special Master were in violation of Vaccine Rules 3(b)(2) and 8(b)(1). Rule 3(b)(2) requires the Special Master, in establishing appropriate proceedings, to afford each party

"a full and fair opportunity to present its case." Rule 8(b)(1) requires the Special Master, in considering all relevant and reliable evidence, to be "governed by principles of fundamental fairness to both parties." Certainly, the rules permit a Special Master to propound questions to a witness, *see* Rule 8(c)(1), but not in a way that eviscerates the fairness of the proceedings. There is no greater objective in Vaccine Act proceedings, or indeed in any judicial proceeding, than to achieve fundamental fairness. *Plavin v. Sec'y of Health and Human Servs.*, 40 Fed. Cl. 609, 622 (1998)(The rules promulgated for use by the special masters "are governed by principles of fundamental fairness."); *See also Campbell*, 69 Fed.Cl. at 778, n. 3 (citing *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)) (stating that due process requires the opportunity to be heard "at a meaningful time and in a meaningful manner."); *Doty v. United States*, 53 F.3d 1244, 1251 (Fed.Cir. 1995)("When procedural violations committed by the agency are egregiously removed from fairness, this constitutes an abuse of the agency's administrative discretion."). The Court concludes that the procedures used by the Special Master in this case failed to satisfy these fundamental due process requirements.

The Special Master's decisions in this case are quite lengthy. The Onset Decision consists of 60 pages, and the Entitlement Decision is 81 pages. The length of the decisions, however, should not suggest the existence of compelling analysis. The Court found the decisions highly repetitive of medical records, citing the same facts over and over, and not especially insightful. Although the medical records here are ample, the relevant facts are not complex. The length of these decisions, 141 pages in total, was unnecessary. A single hearing followed by a concise, single decision likely would have expedited what is now a five-year old case.

The Court heard oral argument in this matter on November 5, 2009. As expressed during the argument, the Court is deeply concerned about the lack of fundamental fairness in the Special Master's proceedings. In rejecting the testimony of all fact witnesses, the Special Master applied every conceivable inference against Petitioners. In the Court's view, however, the testimony of the fact witnesses and the April 14, 2001 notation of Dr. Baum may be entirely consistent. Dr. Baum's notation of two prior episodes "this week" does not mean that the parents could not have observed other episodes during the week after the DTaP vaccination. When confronted with their daughter's acute life threatening seizure on April 14, 2001, it neither is remarkable nor surprising that anxious parents may not have focused on divulging Megan's entire medical history for purposes of the Vaccine Act. Without an explanation from Dr. Baum of what "this week" really means, the Court could not say that this notation should determine the outcome of the case.

■ The Court unfortunately has had other similar experiences with this Special Master. *See, e.g., Boley v. Sec'y of Health and Human Servs.*, 82 Fed.Cl. 407 (2008); *Adams v. Sec'y of Health and Human Servs.*, 76 Fed.Cl. 23 (2007); *Campbell*, 69 Fed.Cl. 775 (2006). The Court is mindful that eight years have elapsed since the relevant events occurred, but a remand appears necessary to obtain a fuller record. The Court is interested in seeing what the expert witnesses would say without the thirteen-day onset restriction imposed by the Special Master. The Court also is compelled to offer the fact witnesses an opportunity to supplement their testimony without excessive interruptions, and without two rounds of cross-examination, one from the Special Master and one from opposing counsel. Ordinarily, the Court would remand the matter to the originally assigned Special Master, but fundamental fairness would be better assured here by assigning the case on remand to a different Special Master. The Court makes no finding at this time whether Petitioners are entitled to recover. The Court rules simply that the proceedings below did not meet the fundamental fairness requirement of the Vaccine Act, and that the proceedings should be reopened before a different Special Master to assure that fairness is achieved. A new Special Master should confer with counsel to determine the procedures to be employed, and the additional evidence to be presented.

Accordingly, based upon the foregoing, Petitioners' Motion for Review is GRANTED. The Special Master's July 30, 2007 Ruling on Onset and July 31, 2009 Entitlement Decision are VACATED. This matter is REMANDED to the Office of Special Masters for reassignment to a new Special Master, who may conduct additional proceedings consistent with this Remand Order. Pursuant to Vaccine Rule 28(b), the period of this remand shall not exceed 90 days.

IT IS SO ORDERED.